IN  THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JOSEPH W. EDWARDS, #346-493,          :

     Petitioner                                        :

     v.                                                     :     CIVIL ACTION NO. RDB-15-1888

WARDEN FRANK BISHOP and          :
The ATTORNEY GENERAL FOR THE
  STATE OF MARYLAND,                      :

     Respondents                                   :

## MEMORANDUM OPINION

Joseph W. Edwards filed this timely, self-represented Petition for Writ of Habeas Corpus

pursuant to 28 U.S.C. § 2254, attacking his June 30, 2007 conviction from the Circuit Court for

Charles County, Maryland for first-degree felony murder and related offenses.   (ECF 1).

Respondents, the Warden of North Branch Correctional Institution where Edwards is confined

and the Attorney General of the State of Maryland, filed an Answer.   (ECF 16).   Edwards,

through counsel, submitted an Amended Petition (ECF 25), prompting an additional Response

(ECF 29) and Reply.   (ECF 32).

Having reviewed the parties' submissions, the Court finds no need for an evidentiary

hearing.[1]   *See* Rule 8(a), *Rules Governing Section 2254 Cases in the United States District

Courts* and Local Rule 105.6 (D. Md. 2016);  *see also Fisher v. Lee*, 215 F. 3d 438, 455 (4th Cir.

2000) (petitioner not entitled to a hearing under 28 U.S.C. §2254(e)(2)).   For the reasons set forth

herein, the Court shall DENY and DISMISS the Petition with prejudice and SHALL NOT

ISSUE a Certificate of Appealability.

---

[1] Accordingly, Edwards' Request for Hearing (ECF 33) is denied.

## BACKGROUND

On February 2, 2007, Edwards was charged in the Circuit Court for Charles County with first-degree felony murder, first-degree premeditated murder, robbery with a dangerous weapon, conspiracy to commit first-degree murder, conspiracy to commit first-degree assault, conspiracy to commit robbery with a dangerous weapon, first-degree assault, and use of a handgun in the commission of a crime of violence in connection with the death of Steven McGregor.   Edwards also was charged with attempted first-degree premeditated murder, attempted second-degree murder, robbery with a dangerous weapon, conspiracy to commit first-degree murder, conspiracy to commit robbery with a dangerous weapon, conspiracy to commit first-degree assault, first-degree assault, and use of a handgun in the commission of a crime of violence in connection with the shooting of Steven Windley.  (ECF 16, Ex. 1 at pp. 3-10).  The facts adduced at Edwards' jury trial, summarized by the Court of Special Appeals of Maryland, follow:

> On December 28, 2006 around 11:30 p.m., Steven McGregor, Steven Windley, and three other men were in and around a car in the 3200 block of Westdale Court in Waldorf.  They were approached by [appellant], and four other men.  As a result of the ensuing events, Mr. McGregor was shot and killed, and Mr. Windley was shot and paralyzed.  The surviving victims, as well as three of [appellant's] accomplices, testified at trial.
>
> Marco Coates, who was in the car with Mr. McGregor and Mr. Windley, offered the following account of the events leading up to the shooting.  On December 28, he, Robert Barbour, and Mr. Windley drove to a basketball tournament in Calvert County in Mr. Barbour's blue Dodge Magnum. After the tournament, Mr. McGregor joined them, and they drove back to Waldorf.  In Waldorf, they saw Timothy Grimes in the Westdale Court area and picked him up. Eventually, Mr. Barbour, who was driving, parked in the 3200 block of Westdale Court, and Mr. Coates and Mr. Grimes got out of the car to smoke.
>
> Mr. Coates explained that either Mr. Barbour or Mr. McGregor got a phone call. About thirty seconds later, five men came from behind the town homes around the court. Mr. Coates saw a "big, big" chrome gun and heard shots. He and Mr. Grimes then "took off." Initially, Mr. Coates hid behind a bush.  He soon crept

back towards the car, however, and got underneath an Expedition. From his position underneath the SUV, Mr. Coates saw the men kicking Mr. Barbour in the face and saw the men trying to take Mr. Windley's jacket.

In addition to shots from the chrome gun, Mr. Coates testified that he heard shots from another gun. Some shots were fired at the tires, and some shots were fired directly into the car. As the five men were leaving, one man came back and fired a final shot into the car from behind the passenger seat. The five men then returned from the direction they came.

After the men left, Mr. Coates returned to the car. Mr. McGregor had a bullet in his head. Mr. Windley was face down on the ground and could not get up.

Mr. Coates stated that he had known [appellant] for three years. Despite the fact that the man with the chrome gun wore a mask that covered his face from the nose down, Mr. Coates claimed that [appellant] was that man. Mr. Coates also identified [appellant] as the person who fired the final shot into the car. According to Mr. Coates, [appellant] was wearing a black, gray and red North Face jacket. He had light skin and wore his hair in long "twisties."

Robert Barbour, who was the driver of the car, also testified. His account follows. After Mr. Barbour and the car's other occupants picked up Timothy Grimes, they went to Janelle Love's court. She was outside, and they asked her for cigarettes. While they were there, Mr. Barbour received a call from Angel Park. Ms. Park asked him if he had any "weed." When he said no, she asked who was with him, and he told her. She then asked where they were, and he told her that too. Ms. Park said she would call him back. At some point, Mr. Barbour and his companions left Ms. Love's court and went to Mr. Windley's court.

About two minutes after the first call, Ms. Park called Mr. Barbour again. She asked where they were, and Mr. Barbour told her they were at Mr. Windley's court. Ms. Park told him that she would come through in about five minutes.

About one to two minutes after the second call Mr. Barbour heard a "loud boom" Mr. Barbour ducked his head and tried to start the car. As he did so, he and Mr. Windley were pulled out of the car. Mr. Barbour said that the men asked, "Where the money at?" One man went through his pockets, while another man stood over him. Afterwards, Mr. Barbour discovered that $15 dollars and his Sprint Razor phone were taken. Mr. Barbour testified that someone tried to take Mr. Windley's jacket, but stopped when he realized Mr. Windley had been shot. After a man wearing a red and black North Face jacket pointed a chrome gun inside the car and shot, the men ran off.

Timothy Grimes offered his account of the shooting as well. Mr. Grimes testified that he and Mr. Coates were smoking "weed" outside Mr. Barbour's car when five men walked up. Mr. Grimes saw a "big old chrome gun." When

the person holding that gun fired, he and Mr. Coates ran. While he was running, Mr. Grimes slipped and fell. As he lay on the ground, he heard multiple gun shots, none of which were as loud as the first one. Once Mr. Grimes caught his breath, he got up and ran to the end of a section of town houses. As he started to get up again, he heard one final shot, which sounded liked [sic] the first shot he heard.

Mr. Grimes did not identify [appellant] as one of the men who approached the car. He did testify, however, that he had seen [appellant] around one or two o'clock on December 28. Mr. Grimes explained that he was driving when he saw [appellant] in a car with Angel Park. Mr. Grimes testified that when he pulled next to [appellant's] car, [appellant] pulled out a "big old chrome gun" and pointed it at him. Once [appellant] realized who Mr. Grimes was, he put the gun down. According to Mr. Grimes, the gun that he saw that afternoon looked like the gun he saw later that night.

Mr. Windley, who was paralyzed as a result of the shooting, also testified. After Mr. Barbour parked in front of Mr. Windley's house, Mr. Windley passed out. He woke up to gun shots and to Mr. McGregor yelling at Mr. Barbour to pull off. Mr. Windley explained that the passenger side window was shot out, and a silver gun came in the window. Mr. McGregor got shot, and Mr. Windley tried to open the door. When the gun pointed in Mr. Windley's direction, he put up his right arm and was shot in that arm. Mr. Windley was able to unlock the door. As he leaned out, he was shot in the back and fell out of the car.

Mr. Windley testified that he was able to pull himself under the truck parked next to them. Once he was under the truck, someone pulled him out and tried to take his jacket and chain. Mr. Windley held on with his good arm. Mr. Windley testified that he could see a group of guys kicking and beating Mr. Barbour. He told the men to leave Mr. Barbour alone and to come take his jacket. The men came over and again tried to take his jacket. Mr. Windley testified that the men then started running. As they did, one man came back, jumped over him, and shot one more time. Mr. Windley testified that he had two cell phones when he was shot. After the shooting, one phone was missing.

In addition to the victims, three of [appellant's] accomplices, including Angel Park, testified. On December 28, Ms. Park picked up [appellant], who was "just about like" her boyfriend, from his parents' house in Waldorf. [Appellant] had "dreads" and was wearing a red and black North Face jacket. While they were driving, they saw Timothy Grimes, who pulled up beside them. [Appellant] pulled out a gun before he realized who it was. When he saw that it was Mr. Grimes, he put the gun away.

After the encounter with Mr. Grimes, Ms. Park and [appellant] drove to Washington, D.C. to pick up Gator, whose real name is Dewayne Thomas. They then drove to Kennebec Street to pick up Eugene Green and Darryl Smith.

Next, they drove to Alexis Jordan's house, where [appellant] and Mr. Smith got into Mr. Jordan's car. At that point, both cars drove to Clay Terrace, where Mr. Smith got some PCP. Mr. Smith gave one "dipper" to her and Mr. Green, and he kept one "dipper" for the other car. The group then proceeded to a restaurant. While there, Mr. Thomas got into her car.

Both cars then drove to Waldorf, where [appellant] directed her to drive through three or four neighborhoods. At some point, Ms. Park got a call from Tiera Gray who was looking for her boyfriend, Mr. McGregor. Ms. Gray asked for J-Rock's number. After that call, Ms. Park drove to the Thai Seafood bar, where she received a call from [appellant]. Ms. Park, in turn, called Mr. Barbour, whose nickname was Pearl, and asked for J-Rock's number. She also asked about some "weed" and found out where Mr. Barbour was and who he was with. Ms. Park then called [appellant] and told him what she had learned. Next, Ms. Park called Mr. Barbour back and told him that she was on her way.

At that point, the cars drove to a neighborhood she knew as Coventry so that [appellant], Mr. Green, Mr. Thomas, Mr. Smith and Mr. Jordan could rob Mr. Barbour. After she parked, everyone except herself and the female who was driving Mr. Jordan's car got out. The men went towards the playground and were gone for less than ten minutes. Ms. Park heard several gunshots. Not long after that, everyone ran back to her car. They left the area and went back to Kennebec Street.

While they were at Kennebec Street, Ms. Park received a call from Janell Love asking who she was with and what she was doing. Ms. Park told Ms. Love that she was at her aunt's house. [Appellant] then told Ms. Park that she needed to go to where she told Ms. Love she was.

Janae West, who drove Alexis Jordan's car, also testified. According to Ms. West, Mr. Jordan came to her house on December 28 and asked her to drive his car. She complied and drove Mr. Jordan, [appellant] and another "boy" to Waldorf. When they arrived at a town house community, she and the woman who drove the other car parked. Ms. West testified that all of the males got out of the cars and went around the corner behind some houses. They were gone for approximately ten minutes, during which time she heard gun shots. About two minutes after hearing the shots, the men came back. [Appellant], Mr. Jordan and the other man got into Mr. Jordan's car, and they left.

Eugene Green testified as well. According to Mr. Green, [appellant] called him on December 28 and asked him to come "chill" at the apartment on Kennebec Street. When he arrived, Ms. Park and Mr. Thomas were also there. [Appellant] asked if he wanted to, go to Waldorf, and he [said] "yes." According to Mr. Green, [appellant] said that they were going to Waldorf to "chill," but he also said that if he saw Pudge and "someone else" he was going to rob them. Mr. Green

and Mr. Thomas drove to Waldorf in Angel Park's car, and [appellant], Darryl Smith and Mr. Jordan went in a car with another female.

When they got to Waldorf, the two cars parked at the Thai Seafood "go-go." While they were there, Ms. Park got a phone call. [Appellant] asked Ms. Park who she was talking to and told her to take him "to whoever she was talking to."

The cars then drove to a location he knew as "AV." The women stayed in the car, and the men walked towards a playground. They followed a path and ended up in a parking lot. Mr. Green saw Mr. Coates using the bathroom. [Appellant], who was wearing a red and black North Face jacket, a mask and a hoodie, fired a silver gun in the air. According to Mr. Green, [appellant] pointed the gun at Mr. Coates. At that point, Mr. Green left and went back to the car. About five minutes later, the other men came back. Everyone got in the cars, and they left. As they were leaving the area, they saw a police car.

Darryl Smith, who was the last accomplice to testify, testified as follows. Mr. Green and [appellant] came to his home on Kennebec Street on December 28. [Appellant's] girlfriend picked them up, and they drove to D.C., where Mr. Thomas joined them. [Appellant] talked to Mr. Thomas about going to Waldorf to beat up someone named Dejuan. They all then drove to Alexia Jordan's house. After making other stops, the two cars drove to Waldorf.

At first, they went to a gas station. Then, they drove through some town homes looking for Dejuan and Pudge. Next, they went to a store, where Mr. Smith and Mr. Jordan bought ski masks, one of which they gave to [appellant]. After getting the masks, they drove through some more town homes. [Appellant] said he saw who he was looking for, so they drove to the back of the town homes, parked and got out.

The men then walked through some woods and past a playground. When they heard some guys laughing in the parking lot, [appellant] pulled down his mask, and they all ran towards the Dodge Magnum. According to Mr. Smith, [appellant]] and Mr. Jordan were the only people who had guns. [Appellant] fired once into the air with a silver revolver. He then ran to the right rear passenger door, opened it, and said, "Whoa." Mr. Jordan fired multiple shots in the back of the car. [Appellant] then pistol whipped someone in the car. Everyone ran back the way they came.

Mr. Smith testified that when he, Mr. Thomas and [appellant] got into Angel's car [appellant] had two cell phones and some money in his hand. Eventually, both cars went back to Kennebec Street. There, [appellant] told [Ms. Jordan] to get rid of the guns. Mr. Smith stated that at some point [appellant] had told him the gun was a .357.

When Mr. Windley testified, he stated that he saw Mr. McGregor with a cell phone prior to the shooting. Similarly, Mr. Barbour testified that he saw Mr. McGregor talking on his cell phone before the shooting. When the police searched Mr. McGregor's pockets after the shooting, however, they did not recover a cell phone.

Mr. Smith testified that when the men returned to Kennebec Street after the shooting, he took the cell phones from [appellant], broke them and threw them in some bushes. Detective Chris Shankster responded to 904 Kennebec after the shooting. There, he recovered a cellular telephone battery from the ground. The battery was compatible with only an LG CU500 cell phone. Detective Shankster also met with Mr. McGregor's girlfriend, Ms. Gray, after the shooting. She gave him a box for an LG CU500 Cingular telephone and told the detective that it was the box Mr. McGregor's cell phone had come in.

(ECF 16, Ex. 9). Based on this evidence, the jury convicted Edwards of first-degree felony murder, first-degree assault, and illegal use of a handgun with respect to victim Steven McGregor, and first-degree assault and illegal use of a handgun with respect to victim Steven Windley. (*Id.*; *see also* Ex. 1). Edwards was sentenced to life imprisonment for the first-degree felony murder of McGregor, a consecutive 20-year sentence for the first-degree assault of Windley, and two 20-year sentences for the handgun convictions, one of which was to run concurrent to the life sentence and the other to run concurrent to the first-degree assault sentence.[2] (*Id.,* Ex. 1 at pp. 3-10, Ex. 9 at p. 1).

## PROCEDURAL HISTORY

On direct appeal, Edwards raised the following questions:

(1) Was the jury's verdict of guilty of felony murder inconsistent with its verdict of not guilty of robbery with a danger weapon, and must the felony murder conviction be reversed as a result?

(2) Did the trial court commit plain error in instructing the jury on felony murder?

(3) Did the trial court err when it sent a note to the jury without first informing Edwards and his counsel and when it thereafter did not disclose the jury's response to Edwards and his counsel?

---

[2] Edwards was acquitted of all charges relating to Robert Barbour, Timothy Grimes, and Marco Coates. (*Id.*).

   (4)  Did the trial court err in failing to disclose to defense counsel the fact that a juror may have seen Edwards being transported? and

   (5)  Did the trial court abuse its discretion in denying Edwards' motion for a continuance?

(ECF 16, Exs. 7-9).   In its March 11, 2009 unreported opinion, the Court of Special Appeals affirmed Edwards' judgment of conviction.   The appellate court found Edwards' inconsistent verdict argument unpreserved.   (*Id.*, Ex 9 at p. 23).   Although finding the jury instruction argument also unpreserved, the appellate court noted it "intertwined . . . with his first contention" regarding the inconsistent verdicts, and addressed it, declining to recognize plain error.   (*Id.*). Edwards' request for *certiorari* review by the Maryland Court of Appeals was denied on June 12, 2009.[3]   (*Id.*, Ex. 10).

   On May 27, 2010, Edwards filed a petition for post-conviction relief in the Circuit Court for Charles County.   (ECF 16, Ex. 1 at p. 20).   The petition, as amended, claimed trial counsel was ineffective for failing to (1) preserve the record for appeal, (2) object properly to inconsistent verdicts, (3) object to the absence of instructions related to attempted robbery and attempted armed robbery, (4) cross-examine Marco Coates effectively, and (5) obtain a jury instruction on second-degree felony murder.   (*Id.*, Ex. 11, 12).   Following an October 13, 2011 hearing, the post-conviction court denied relief as to all grounds raised in an opinion and order filed on July 3, 2014.   (*Id.,* Ex. 1, 13).

   Edwards filed an application for leave to appeal the post-conviction court's decision with the Court of Special Appeals, reiterating his claims that trial counsel was ineffective for failing to (1) object properly to inconsistent verdicts on felony murder and armed robbery, (2) object to the

---

[3] Edwards' judgment became final for direct appeal purposes on September 10, 2009, when the time for seeking review in the Supreme Court of the United States expired.  *See* Sup. Ct. Rule 13.1 (requiring petition for writ of certiorari to be filed within 90 days of the date of judgment from which review is sought).

absence of instructions related to attempted robbery and attempted armed robbery, and (3) obtain

a jury instruction on second-degree felony murder.  Edwards also argued relief should be granted

based on the cumulative effect of those errors.  (ECF 16, Ex. 14).  On June 8, 2015, the Court of

Special Appeals summarily denied Edwards' application for leave to appeal.[4]  (*Id.,* Ex. 1 at p.

24).

## CLAIMS PRESENTED HERE

Edwards now asserts that trial counsel was ineffective for (1) failing to object properly

and timely to an inconsistent verdict, (2) failing to object to the absence of instructions related to

attempted robbery and attempted armed robbery, (3) failing to object to the absence of a jury

instruction on second-degree felony murder, and (4) the cumulative effect of these errors.  (ECF

25).  Each of these grounds for relief was fully examined in post-conviction proceedings and thus

exhausted.[5]

## STANDARD OF REVIEW

An application for writ of habeas corpus may be granted only for violations of the

Constitution or laws of the United States.  28 U.S.C. § 2254(a).  The federal habeas statute at 28

U.S.C. ' 2254 sets forth a Ahighly deferential standard for evaluating state-court rulings.@ *Lindh*

*v. Murphy*, 521 U.S. 320, 333 n.7 (1997); *see also Bell v. Cone*, 543 U.S. 447 (2005).  The

standard is "difficult to meet," and requires courts to give state-court decisions the benefit of the

doubt.  *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (internal quotation marks and citations

omitted); *see also White v Woodall*, __ U.S.__, __, 134 S. Ct 1697, 1702 (2014), quoting

---

[4] The court's mandate issued on July 8, 2015.  (ECF 16, Ex. 1 at p. 24).

[5] Respondents argue that claims that trial counsel was ineffective *for failing to request* jury instructions presented in the amended petition (ECF 25 at p. 9) differ from the claims that trial counsel was ineffective *for failing to object to the absence of* these instructions raised in state post-conviction proceedings, and that restatement of the claims mandate they be rejected under the procedural default doctrine.  (ECF 29 at p. 9).  This parsing of language amounts to a distinction without a difference.  This Court shall consider the claims on the merits.

*Harrington v. Richter*, 562 U.S. 86, 103 (2011) (state prisoner must show state court ruling on claim presented in federal court was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair minded disagreement.").

A federal court may not grant a writ of habeas corpus unless the state's adjudication on the merits: 1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States"; or 2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. ' 2254 (d). A state adjudication is contrary to clearly established federal law under § 2254(d)(1) where the state court 1) "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law," or 2) "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [the Supreme Court]." *Williams v. Taylor*, 529 U.S. 362, 405 (2000).

Under the "unreasonable application" analysis under 2254(d)(1), a "state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Richter*, 562 U.S. at 103 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Thus, "an unreasonable application of federal law is different from an incorrect application of federal law." *Id*. at 785 (internal quotation marks omitted).

Further under § 2254(d)(2), "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). "[E]ven if reasonable minds reviewing the

record might disagree about the finding in question," a federal habeas court may not conclude that the state court decision was based on an unreasonable determination of the facts. *Id.* **"[A] a federal habeas court may not issue the writ simply because [it] concludes in its independent judgment that the relevant state-court decision applied established federal law erroneously or incorrectly."** *Renico v. Lett,* 599  U.S. 766, 773 (2010).

The habeas statute provides that "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). "Where the state court conducted an evidentiary hearing and explained its reasoning with some care, it should be particularly difficult to establish clear and convincing evidence of error on the state court's part." *Sharpe v. Bell*, 593 F.3d 372, 378 (4th Cir. 2010). This is especially true where state courts have "resolved issues like witness credibility, which are 'factual determinations' for purposes of Section 2254(e)(1)." *Id.* at 379.

The Antiterrorism and Effective Death Penalty Act (AEDPA), enacted in 1996 and codified at 28 U.S.C. § 2254, erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court. AEDPA requires "a state prisoner [to] show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error ... beyond any possibility for fairminded disagreement." *Richter,* 562 U.S. at 103. "If this standard is difficult to meet"—and it is—"that is because it was meant to be." *Id.,* 102. A federal court reviewing a habeas petition will not lightly conclude that a State's criminal justice system has experienced the "extreme malfunctio[n]" for which federal habeas relief is the remedy. *Id.* (internal quotation marks omitted).

When a petitioner alleges ineffective assistance of counsel, he must show both that counsel's performance was deficient and that the deficient performance prejudiced his or her defense. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). The second prong requires the court to consider whether there was "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A strong presumption of adequacy attaches to counsel's conduct, so strong in fact that a petitioner alleging ineffective assistance of counsel must show that the proceeding was rendered "fundamentally unfair" by counsel's affirmative omissions or errors. *Id.* at 696; *see Burt v. Titlow*, 134 S. Ct. 10, 17 (2013). Although "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable," it is equally true that "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690–91. Where circumstances are such that counsel should conduct further investigation to determine "whether the best strategy instead would be to jettison [a chosen] argument so as to focus on other, more promising issues," failure to conduct further investigation can amount to constitutionally deficient assistance. *See Rompilla v. Beard*, 545 U.S. 374, 395 (2005) (O'Connor, J., concurring).

A showing of prejudice requires that 1) counsel's errors were so serious as to deprive the defendant of a fair trial whose result is reliable, and 2) there was a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. *See Strickland*, 466 U.S. at 687, 694. "The benchmark [of an ineffective assistance claim] must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id*. at 686. It is not enough "to

show that the errors had some conceivable effect on the outcome of the proceeding." *Id*. at 693. Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id*. at 687; *see also Richter*, 562 U.S. at 104 (citing *Strickland*, 466 U.S. at 687).  A determination need not be made concerning the attorney's performance if it is clear that no prejudice would have resulted had the attorney been deficient.  *Strickland*, 466 U.S. at 697.

## Analysis

All of Edwards' claims hinge on an assertion of ineffective assistance of trial counsel. With respect to the first-degree felony murder charge, Edwards argues trial counsel needed to do one of two things. First, if counsel believed that there was adequate proof before the jury that Edwards committed attempted robbery, he needed to demand that the jury receive an instruction for that charge. If, on the other hand, counsel believed that there was *not* adequate proof of attempted robbery before the jury, he needed to — once the jury returned an acquittal on armed robbery but convicted him on first-degree felony murder — immediately object to the legally inconsistent verdict so as to preserve the error for review. Counsel did neither.

Further, Edwards argues that counsel was oblivious to the fact that the charges in the case provided a basis for an instruction to the jury on a lesser offense, second-degree felony murder, which would carry a maximum sentence of only 30 years in prison, rather than life incarceration. He contends that because the jury was likely to find that he was guilty of first-degree assault and that a murder had occurred during the commission of that offense, he needed to protect against the possibility that the jury would improperly convict him of *first-degree* felony murder rather than *second-degree* felony murder. Edwards now complains that counsel neglected to even consider these circumstances and options, much less request the necessary instructions, and that these deficiencies in representation greatly prejudiced him.

Finally, Edwards argues that he was deprived of his right to have the jury instructed on all the elements of a felony-murder charge and was deprived of his opportunity to have the appellate court apply recent favorable law concerning inconsistent verdicts to his case and reverse his convictions. As a result of these cumulative errors, he will spend the rest of his life in prison, rather than serve a maximum of 30 years of incarceration.  Edwards asserts there is a reasonable probability that, had counsel performed sufficiently, the result of the prosecution would be different. He asks this Court to exercise its habeas corpus power to vacate his sentence and order a new trial.

As previously noted, Edwards was convicted of first-degree felony murder, first-degree assault, and illegal use of a handgun with respect to victim Steven McGregor, and first-degree assault and illegal use of a handgun with respect to victim Steven Windley.[6]  In addition to his claim concerning inconsistent verdicts, Edwards' ineffective assistance claims also address the lack of instructions related to attempted robbery, attempted armed robbery, and second-degree felony murder, crimes for which Edwards was never charged.  The statutory provisions for these crimes inform both the inconsistent verdict and the jury instruction aspects of Edwards' ineffective assistance claims, and are set forth below.

Maryland defines murder in the first degree, Md. Code Ann., Crim. Law Art., § 2-201 as:

(1) a deliberate, premeditated, and willful killing;
(2) committed by lying in wait;
(3) committed by poison; or

(4) committed in the perpetration of or an attempt to perpetrate:

---

[6] Edwards was acquitted of first-degree premeditated murder, robbery with a dangerous weapon, conspiracy to commit first-degree murder, conspiracy to commit first-degree assault, and conspiracy to commit robbery with a dangerous weapon with regard to McGregor, and acquitted of attempted first-degree premeditated murder, attempted second-degree robbery, robbery with a dangerous weapon, conspiracy to commit first-degree murder, conspiracy to commit robbery with a dangerous weapon, conspiracy to commit first-degree assault with regard to Windley.  (ECF 16, Ex. 1 at pp. 3-10, Ex. 9 at p. 1).

\* \* \*

    (ix) robbery under § 3-402 or § 3-403 of this article.

Thus, first-degree murder can be premeditated, or it can occur during the commission of a felony.  The penalty upon conviction of first-degree murder, whether premeditated or committed during a felony, is imprisonment for life, with or without the possibility of parole.  *Id.* at § 2-201(b).

In contrast, second-degree murder is defined generally under § 2-204(a) as "[a] murder that is not in the first degree under § 2-201.  A person who commits murder in the second degree is guilty of a felony and on conviction is subject to up to thirty years' imprisonment."  *See* Md. Code Ann., Crim. Law Art., § 2-204(b).

Robbery is defined in § 3-401(b) as action to deprive by withholding property of another:

(1) permanently;
(2) for a period that results in the appropriation of a part of the property's value;
(3) with the purpose to restore it only on payment of a regard or other compensation; or
(4) to dispose of the property or use or deal with the property in a manner that makes it unlikely that the owner will recover it.

Section 3-402(a) makes it a crime to commit or attempt to commit robbery."  Under § 3-402(b), "[a] person who violates this section is guilty of a felony…" and, pursuant to § 3-402(b), may be sentenced to 15 years' imprisonment.  Similarly, § 3-403(b) states that "[a] person may not commit or attempt to commit robbery under § 3-402 . . . (1) with a dangerous weapon," and denotes that conviction under the statute constitutes a felony subject to 20 years' imprisonment.

Assault in the first degree is defined in § 3-202 as follows:

(a) *Prohibited.* –     (1) A person may not intentionally cause or attempt to cause serious physical injury to another.
    (2) A person may not commit an assault with a firearm, including
        (i)  a handgun, antique firearm, rifle, shotgun, . . .

\* \* \*

15

(iv)  a regulated firearm, . . .

(b) *Penalty.* –        A person who violates this section is guilty of the felony of assault in the first degree and on conviction is subject to imprisonment not exceeding 25 years.

Edwards correctly points out that he was acquitted of premeditated murder but convicted of felony murder, which requires a guilty finding of one of the statutorily enumerated offenses (such as robbery) outlined in the first-degree murder statute. His conviction of first-degree assault is not among the crimes enumerated in the statute as a crime supporting a felony murder conviction. This anomaly provides the basis for his ineffective assistance claims, both in the context of the inconsistent verdict claim and his argument concerning a lack of jury instructions.

## A.      Inconsistent Verdicts

The United States Supreme Court's decision in *United States v. Powell*, 469 U.S. 57 (1984), recognized that an inconsistent jury verdict may stand as a possible exercise of lenity by jurors. Respondents argue that because an inconsistent verdict claim does not assert a violation of federal law, it is not cognizable for § 2254 review. (ECF 16 at pp. 22-23).

Although inconsistent jury verdicts may stand in federal criminal prosecutions, the States need not follow this practice. Maryland's departure from *Powell* was first announced while Edwards' direct appeal was pending.[7] *See Price v. State*, 405 Md. 10, 19 (2008), *see also McNeal v. State*, 426 Md. at 458 (2012) ("legally inconsistent verdicts are those where a defendant is acquitted of a 'lesser included' crime embraced within a conviction for a greater offense."). In *Price,* the Court of Appeals held that while legally inconsistent verdicts were no

---

[7] On direct appeal, Edwards claimed that the trial court improperly accepted what he perceived to be an inconsistent verdict. The appellate court recognized that this contention was unpreserved, but nonetheless addressed it as intertwined with another unpreserved contention of trial court error for failure to instruct the jury on "attempted robbery." The appellate court found no basis to exercise its discretion to consider these claims under its plain error exception. (ECF 25, Ex. 4 at pp. 22-24).

longer permissible, the court's holding was made retroactive only to "similarly situated cases on direct appeal where the issue was preserved." *Id*. 405 Md. at 29.  The Court of Appeals noted in *Price* that "we should not permit the defendant to accept the jury's lenity in the trial court, only to seek a windfall reversal on appeal by arguing that the jury's verdicts are inconsistent."

Claims that do not assert a violation of federal or constitutional law generally are not cognizable in federal court.  *See generally Wilson v. Corcoran*, 131 S. Ct. 13, 14 (2011) ("Federal courts may not issue writs of habeas corpus to state prisoners whose confinement does not violate federal law."); *Spencer v. Murray*, 18 F.3d 237, 239-40 (4th Cir. 1994) (claim regarding admissibility of evidence that neither relied upon a constitutional provision, nor mentioned a constitutional right as infringed, did not state federal claim).  Had his claim been preserved, Edwards' conviction might have been overturned on direct appeal, based on state law.  The claim, however, was not preserved, and as presented here does not run afoul of federal or constitutional law.  Thus, it provides no basis for habeas corpus relief under 28 U.S.C. § 2254(d)(1).

**B.    Jury Instructions**

More compelling are Edwards' claims of ineffective assistance based upon counsel's failure to move for specific jury instructions regarding several of the underlying felony charges.

Cases cited by Edwards show that prior to AEDPA, this Circuit held trial counsel's failure to object to a lack of instruction on a predicate felony to be "constitutionally deficient." *See  Luchenburg v. Smith,* 79 F.3d 388, 393 (4th Cir. 1996) (erroneous jury charge may form basis of habeas claim, either independently or in conjunction with ineffective assistance of counsel claim, where instruction "so infected the entire trial that the resulting conviction violates due process" by rending trial fundamentally unfair) (citing *Cupp v. Naughten,* 414 U.S. 141, 147

(1973)); *see also Whalen v. United States,* 445 U.S. 684, 693-94 (1980) (felony murder based upon killing in the course of committing rape requires proof of all elements of offense of rape). The pre-AEDPA standard for collateral review of errors in instructions to which no contemporaneous objection was made and no error was assigned on direct appeal was a "cause of actual prejudice" standard, *see United States v. Frady,* 456 U.S. 152, 167-68 (1982), and the "degree of prejudice required [was] a showing that based upon an evaluation of the totality of the events at trial, the instructional error 'by itself so infected the entire trial that the resulting conviction violates due process.'" *Id.* at 169; (citing *Henderson v. Kibbe,* 431 U.S. 145, 154 (1977) (quoting *Cupp,* 414 U.S. at 147); *see also Fulton v. Warden, Md. Penitentiary,* 744 F.2d 1026, 1032 (4th Cir. 1984) (quoting *Henderson,* 431 U.S. at 147). In effect, the petitioner must show a substantial likelihood that the jury would have reached a different verdict if the proper instructions had been given and, consequently, the error in instructions resulted in a fundamental miscarriage of justice. *See Frady,* 456 U.S. at 172; *Henderson,* 431 U.S. at 155-57; *Fulton,* 744 F.2d at 1032-33.

This standard of review outlined by Edwards has been subsumed and restated by the AEDPA standards previously noted.  Edwards' arguments must, therefore, be examined in the context of post-AEDPA precedent.

### 1.    Jury Instruction with Regard to Attempted Robbery

At trial, the State argued that the murder victim, McGregor, was shot during an armed robbery, and Edwards should be convicted of first-degree felony murder in connection with his role as a participant in the robbery.   Although Edwards was charged with robbery with a dangerous weapon and conspiracy to commit robbery with a dangerous weapon (charges on which he was acquitted), he never was charged with attempted robbery, and the jury was not

instructed on the offense.  The jury acquitted Edwards of armed robbery, yet convicted him of first-degree felony murder.

Trial counsel did not request the jury be instructed on lesser offenses such as second-degree murder or attempted robbery, and did not object at trial when the jury returned a verdict of first-degree murder while concurrently failing to convict Edwards of robbery and conspiracy to commit robbery with a dangerous weapon.  Instead, after the jury was discharged and prior to sentencing, counsel argued unsuccessfully that the verdicts were inconsistent and that as a result of the trial court's failure to instruct the jury on the elements of attempted robbery, the felony murder conviction should be stricken.  (ECF 25, Ex. 3 at pp. 10-15; ECF 16, Ex. 6 at pp. 18-19). The trial court declined to do so, and instead construed counsel's belated argument as a "motion to set aside the verdict," noted the jury was properly instructed on the law, and found that inconsistent verdicts were tolerated under Maryland law.  (ECF 16, Ex. 6 at p. 20).

The appellate court found the argument that the trial court failed to instruct the jury on the elements of attempted robbery unpreserved, but nonetheless examined the issue, which it found "intertwined" with Edwards' argument  (also unpreserved) concerning inconsistent verdicts.  The court noted that Maryland law defines a legally inconsistent verdict as occurring when "an acquittal on one charge is conclusive as to an element which is necessary to and inherent in a charge on which a conviction has occurred," citing *Price,* 405 Md. at 38 (internal quotation omitted).  Notwithstanding the inconsistency, the appellate court did not take issue with the verdict as rendered, noting that the jury was told by the trial court that it could find Edwards guilty of felony murder if he committed *or attempted to commit* a robbery (emphasis in the original).  (ECF 25, Ex. 4 at p. 25).

In the context of a failure to give appropriate jury instructions, the appellate court declined to exercise its plenary discretion under Maryland Rule 4-325(e) "to notice plain error material to the rights of a defendant, even if the matter was not raised in the trial court." (ECF 16, Ex. 9 at p. 26). The appellate court found that:

> . . . for purposes of a felony murder conviction, and assuming an instruction on the underlying felony is required, the jury was instructed as to armed robbery and the necessary intent, the vital elements. As highlighted above, on at least six occasions, the court instructed the jury that to find felony murder, it had to find that the killing occurred when appellant or another participating in the crime with him, committed *or attempted to commit* a robbery. [Emphasis in original]. Attempt, in that context, was likely understood by the jury; thus, we do not find the compelling, extraordinary, or exceptional circumstances necessary to exercise our discretion.

(*Id.,* p. 27).[8]

At post-conviction, Edwards argued that trial counsel was ineffective for failing to object to the absence of a jury instruction on attempted robbery or attempted armed robbery and in failing to timely object to the resultant inconsistent verdict. The post-conviction court examined the jury instruction issue in light of the trial record and post-conviction hearing testimony, finding as follows:

> In Petitioner's fourth allegation, he claims that trial counsel was ineffective by not objecting to the Court's failure to instruct the jury concerning attempted robbery and attempted armed robbery. Petitioner argues that, but for counsel's error, the outcome of Petitioner's trial would have been different.
>
> During jury instructions of Petitioner's trial, Judge Chappelle enumerated the elements of simple robbery and robbery with a dangerous weapon (Tr. Transcript, 6-29-07 at 34-36). The instruction on "robbery" was given as robbery the underlying felony to the first degree murder charge. Judge Chappelle also gave an instruction for "attempt" in regards to Petitioner's attempted murder charge, stating:
>
> > "What is an attempt, the definition of an attempt?
> > The defendant is  charged with the crime of attempted murder.

---

[8] The actual instructions are outlined in the appellate opinion, ECF 16, Ex. 9 at pp. 13-15.

Attempt is a substantial step beyond mere preparation toward the commission of a crime. In order to convict the defendant of attempted murder, the State must prove, one, that the defendant took a substantial step beyond mere preparation towards the commission of the crime of attempted murder, and two, that the defendant intended to commit the crime of attempted murder" (Tr. Transcript, 6-29-07 at 38).

Petitioner argues that the Judge did not explain the elements of attempted robbery or attempted armed robbery even though they were underlying crimes which could have supported a felony murder conviction.

Petitioner was not charged with attempted robbery or attempted armed robbery. As those offenses were not enumerated charges, instructions for those offenses were not given. Instructions regarding simple robbery and robbery with a dangerous weapon, as robbery with a dangerous weapon as a separate enumerated offense, were given to the jury, along with hard copies for deliberations. The Court finds no error in the instructions. Petitioner's allegation is without merit.

(ECF 16, Ex. 13 at 8-9).

Edwards contends that the state court findings are deficient. Noting that Respondents take the position that there was "overwhelming evidence"[9] that Edwards attempted to commit a robbery (ECF 29 at 11 n. 1), Edwards questions why the State did not charge him with attempted robbery, did not otherwise submit the offense of attempted robbery to the jury, and did

---

[9] Respondents' position is supported by the evidence; trial testimony produced substantial evidence that the group that included Edwards intended to rob someone in the group that included MacGregor, and took a substantial step toward doing so. Angel Park testified that the group went to the location of the crime to rob Robert Barbour. Eugene Aaron Green, another member of the group of assailants, testified that Edwards directed the group to Waldorf, and stated that if he encountered "Pudge," "he was going to rob him." Darryl Smith, another member of the group of attackers, testified that after driving through the townhouse community once, the group went to a nearby store and bought two ski masks, one of which was given to Edwards. Victims Barbour and Windley both testified that the assailants rifled their pockets and unsuccessfully attempted to take Windley's jacket and "chain." Windley further testified that one of his two cell phones was missing after the incident. Smith testified that after the shootings, he saw Edwards holding two cell phones, some money, and an ID. Smith broke up the cell phones and threw them in some bushes near his home. A cell phone battery was later recovered from those bushes which, it was stipulated, could only be used in the model of cell phone that McGregor was known to carry. (ECF 16, Ex. 8 at pp. 7-8).

not request a jury instruction on attempted robbery. Edwards argues that the trial produced a near-total absence of specific allegations of attempted robbery, and accordingly disputes the State's contention that the predicate crime for his felony murder charge actually was attempted robbery. (ECF 32 at p. 2).

Edwards further argues in the alternative that even if there was sufficient evidence to sustain allegations that he had committed robbery, trial counsel's performance was constitutionally inadequate. He posits that if there was any possibility that the jury would rely on attempted robbery to convict him of felony murder, counsel had a duty to ensure that the jury was specifically instructed as to the elements of that crime. Edwards asks this Court to examine the ineffective assistance claim based on trial counsel's failure to "object to the jury instructions as given" or "request an 'attempt' instruction," which resulted in the state court's finding that counsel failed to "preserve the issue for appellate review." (ECF 25, Ex. 4, p. 26).

In support, Edwards cites *Luchenburg*, 79 F.3d at 390-391. In 1985, Luchenburg was charged in Maryland state court with first-degree rape, first-degree sexual offense, common law assault, carrying a deadly weapon (a knife), and use of a handgun during the commission of a crime of violence in the assault of his estranged wife at gunpoint, and the rape of his sister-in-law at gunpoint and knifepoint. Luchenburg was acquitted of the rape and sexual offense charges against his sister-in-law, including the knife charge, and convicted for assaulting his wife and using a handgun during commission of crime of violence. Although Luchenburg was acquitted of the predicate crimes of violence, the trial court did not throw out the conviction on the compound handgun charge, and sentenced Luchenburg to 20 years imprisonment on that charge (the maximum term possible), as well as a consecutive ten-year sentence on the assault count.

On collateral review, Luchenburg contended that his trial counsel was ineffective for failing to "object to the court's failure to explicitly instruct the jury" that it had to find the petitioner guilty of a predicate crime of violence before it could convict him of a compound handgun charge. Following federal habeas corpus review, the Honorable William M. Nickerson adopted a United States Magistrate Judge's report and recommendation to grant federal habeas corpus relief.  On appeal, the United States Court of Appeals for the Fourth Circuit defined Luchenburg's argument as a "claim of ineffective assistance of trial counsel for failing to take issue with the circuit court's jury instruction[,]" *see id.* at n. 2, and then analyzed trial counsel's "failure to object and request" a proper instruction, *id.* at 393.  The Fourth Circuit found ineffective assistance where counsel failed to request an expanded instruction that more accurately explained to the jury that, under Maryland law, it could not convict a defendant of a compound handgun charge unless it first found him guilty of predicate crime of violence, and that common-law assault was not a predicate "crime of violence."  The appellate court found that trial counsel should have objected to the trial court's instruction and requested an expanded instruction that more accurately explained to the jury (1) that it could not convict Luchenburg of the compound handgun charge unless it first found him guilty of a predicate crime of violence, and (2) that common law assault is not a predicate "crime of violence." Thus, the circuit court's instructions rendered Luchenburg's trial fundamentally unfair, and trial counsel's failure to object was constitutionally deficient, because a reasonable probability existed that but for his failure to object and request an expanded instruction, the result of the proceeding would have been different.

Citing *Fitzgerald v. Thompson,* 943 F.2d 463, 468 (4th Cir. 1991), the Fourth Circuit found that if counsel had requested instructions to the jury that it could only return a guilty

verdict on the compound handgun charge if it first convicted the defendant on a predicate crime of violence, and that common law assault is not a predicate crime of violence, the trial court would have been required to so instruct; the instructions would be binding on the jury; and the jury would have followed the instructions. In light of his acquittal on the predicate crimes of violence, Luchenburg established a reasonable probability that the jury, had they received the proper instructions, would also have acquitted him on the compound handgun charge.

Relying on *Luchenburg,* Edwards argues that because attempted robbery was "an essential ingredient" to the charge of felony murder under Maryland law, *see Newton v. State*, 280 Md. 260, 267 (1977), it was imperative for the trial court to explain the elements of attempted robbery in conjunction with its explanation of the elements of felony murder, and trial counsel's failure to object to the incomplete or absent instruction on attempted robbery amounted to ineffective assistance under the Sixth Amendment. This Court is not persuaded that such prejudice is demonstrated here.

The *Luchenburg* court's analysis focused on the obvious harm that resulted to the defendant, concluding that it was reasonably probable that a different verdict would have been rendered. As noted by the post-conviction court in Edwards' case:

> In Petitioner's fourth allegation, he claims that trial counsel was ineffective by not objecting to the Court's failure to instruct the jury concerning attempted robbery and attempted armed robbery. Petitioner argues that, but for counsel's error, the outcome of Petitioner's trial would have been different.
>
> During jury instructions of Petitioner's trial, Judge Chappelle enumerated the elements of simple robbery and robbery with a dangerous weapon (Tr. Transcript, 6-29-07 at 34-36). The instruction on "robbery" was given as robbery was the underlying felony to the first degree murder charge. Judge Chappelle also gave an instruction for "attempt" in regards to Petitioner's attempted murder charge, stating:

> "What is an attempt, the definition of an attempt? The defendant is charged with the crime of attempted murder.
>
> Attempt is a substantial step beyond mere preparation toward the commission of a crime. In order to convict the defendant of attempted murder, the State must prove, one, that the defendant took a substantial step beyond mere preparation towards the commission of the crime of attempted murder, and two, that the defendant intended to commit the crime of attempted murder" (Tr. Transcript, 6-29-07 at 38).

> Petitioner argues that the Judge did not explain the elements of attempted robbery or attempted armed robbery even though they were underlying crimes which could have supported a felony murder conviction. Petitioner was not charged with attempted robbery or attempted armed robbery. As those offenses were not enumerated charges, instructions for those offenses were not given. Instructions regarding simple robbery and robbery with a dangerous weapon, as robbery with a dangerous weapon was a separate enumerated offense, were given to the jury, along with hard copies for deliberations. The Court finds no error in the instructions. Petitioner's allegation is without merit.

*Id*. at 8-9. In essence, an instruction on attempt was provided, even though attempted robbery or attempted armed robbery were not charged. Given the trial testimony, it is clear that one or more of Edwards' cohorts robbed or attempted to rob the victims, that Edwards was one of two shooters, and that after the shooting, Edwards had the decedent's cell phone and some money in his hand. Edwards cannot make a showing that it was reasonably probable that a different verdict would have been rendered had the lesser-included offenses been further defined during jury instructions.

Further, this Court cannot rely on the *Luchenburg* standard of review, given the evolution of case law following the 1996 enactment of AEDPA. Under the current standard of habeas corpus review, a state court decision is "contrary to" clearly established federal law if the state court "arrives at a conclusion opposite to that reached by the [U.S. Supreme] Court on a

question of law or if the state court decides a case differently than the [U.S. Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor,* 529 U.S. at 412-13.  As to whether a state court decision is an "['objectively'] unreasonable application" of clearly established federal law, the state court must "identif[y] the correct governing legal principle from the [Supreme] Court's decisions but unreasonably appl[y] that principle to the facts of the prisoner's case., *id.* at 410, and "state-court judgments must be upheld unless, after the closest examination of the state-court judgment, a federal court is *firmly convinced* that a federal constitutional right has been violated." *Id.* at 389 (emphasis added). Federal habeas relief is precluded, "so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Richter,* 562 U.S. at 88, citing *Yarborough v. Alvarado,* 541 U.S. 652, 664 (2004).

Under AEDPA, federal habeas relief for any claim adjudicated on the merits in state court is prohibited, unless one of the exceptions listed in § 2254(d) is met.  *Premo v. Moore,* 562 U.S. 115, 121 (2011).  Here, the relevant exception would permit relitigation where the earlier state decision resulted from an 'unreasonable application of clearly established federal law, *id.*; 28 U.S.C. § 2254(d)(1), and the state court factual determination cannot be deemed "unreasonable" merely because this Court would reach a different conclusion.  *Wood v. Allen,* 558 U.S. 290, 301 (2010) (citation omitted); 28 U.S.C. § 2254(d)(2).  In other words, under § 2254(d), the question is whether there is any reasonable argument that trial counsel met *Strickland's* deferential standard.  *Premo,* 562 U.S. at 122.

In disputing counsel's alleged error in failing to advocate for jury instructions on attempted robbery, Respondents adopt the state post-conviction court's understanding that "Petitioner was not charged with attempted robbery or attempted armed robbery. As those

offenses were not enumerated charges, instructions for those offenses were not given." (ECF 16 at p. 10).

Edwards counters this argument based on the Maryland Pattern Jury Instructions and *Mumford v. State*, 19 Md.App. 640 (C.S.A. 1974). He contends that regardless of whether a defendant charged with felony murder is also expressly charged with the predicate felony, the jury must be *instructed* on the predicate felony because it is itself an element of felony murder. (ECF 25 at pp. 11-13).

Mumford, a fifteen-year-old female, was convicted of first-degree murder for her role in the burglary of a home. While Mumford was burglarizing the home, she also assisted in the robbery of the homeowner, who had pulled into her garage during the event only to be robbed, raped, and murdered by Mumford's cohorts. While the *Mumford* court acknowledged that under Maryland law, a defendant who acts with others to perpetrate a felony may be found guilty of felony murder without being indicted and convicted of an underlying felony, *id.* at 643, it nonetheless found that under the facts of the case, the jury should have been instructed that Mumford could be found guilty of felony murder only if there were a direct causal connection between the homicide and the felony for which she was convicted (robbery). *Id.* at 644. Unlike the facts of *Mumford*, a direct causal connection exists here; Edwards clearly was identified as one of two masked gunmen acting with accomplices during a robbery that resulted in the death of a victim.[10]

---

[10] Edwards notes that Maryland courts have recently reiterated that instructing on a predicate felony requires instructing on the specific *elements* of that felony. *See Austin v. State*, Md. Ct. Spec. App., Sept. Term 2013, No. 1172 at 11-12 (Dec. 23, 2014) (unreported) ("the trial court's failure to instruct the jury as to the elements of robbery or attempted robbery — which would thereby constitute a failure to properly instruct the jury as to the elements of felony murder — renders this case the rare situation for which plain error review is appropriate"). *Austin* provides no basis for relief; as pointed out by the appellate court reviewing Edwards' conviction, the trial court did instruct the jury as to the felony charged (robbery), and also instructed generally as to attempted robbery (which was not charged).

Edwards asks this Court to disregard the state post-conviction court's "cursory and empty reasoning" and determine whether he received constitutionally sufficient representation when his attorney failed to ensure that a jury was instructed on every element of the crime that sent him to prison for life, based on "the state of the law as it existed at the time of . . . trial [which] required that the jury be instructed on all the elements of the crime of felony murder, including the elements of the predicate felony," so that the jury would have had a full and correct understanding of the charges. (ECF 32 at p. 5). Alternatively, he contends that had the trial court refused to give the instruction, the issue would have been preserved for appeal. (*Id.*). Edwards argues the alleged error is therefore directed squarely at his counsel's performance, which deprived him of constitutional protections during the trial. He notes that this Court has recognized that an attorney's failure to ensure that a jury is instructed on the elements of a crime is a mistake of constitutional magnitude, citing *Ruiz v. United States*, 146 F. Supp. 3d 726, 733 (D. Md. 2015) (failure to ensure instruction on *mens rea* element), and *Moore v. Garraghty*, 932 F.2d 963 (4th Cir. 1991) (unpublished); *Luchenburg*, 79 F.3d at 393. Respondents counter that because Edwards was not charged with the predicate offense of attempted robbery, "there was no reasonable basis for trial counsel to object to the absence" of instructions on the elements of attempted robbery.

Whether a failure to request a particular jury instruction constitutes deficient performance under federal law requires more than a simple failure to raise a claim, actual prejudice must be demonstrated. *See Strickland*, 466 U.S. at 691 ("An error by counsel even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment."); *see also Kimmelman v. Morrison,* 477 U.S. 365, 374 (1986) ("The essence of an ineffective-assistance claim is that counsel's unprofessional errors so upset

the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect"). As noted above, the jury was instructed on attempted robbery, and the facts adduced at trial provide a sufficient basis for a finding that Edwards committed a felony murder in conjunction with his cohorts' actions, which included robbery of the victims. This allegation of error provides no basis for habeas corpus relief pursuant to 28 U.S.C. §§ 2254(d)(1) and (2).

### 2.    Jury Instruction with Regard to Second-Degree Murder

The allegation that counsel rendered ineffective assistance by failing to request a jury instruction concerning second-degree murder was first raised in Edwards' second supplement to his petition for post-conviction relief. (ECF 16, Ex. 13 at p. 3). Because counsel did not request such instruction, which Edwards categorizes as a lesser variety of felony murder, he was exposed upon conviction to a life sentence. Had he instead been convicted of second-degree murder, that conviction carried a maximum 30 year term of incarceration.

The post-conviction court summarized counsel's testimony as follows. At the post-conviction hearing, counsel explained that he did not request a second-degree felony murder instruction because it would have added an additional charge to the already substantial 31-count charging document, and counsel did not want to provide yet another reason upon which a jury could find Edwards guilty. (*Id.* at p. 9). Counsel also admitted that at the time of trial in 2007, he did not know that a first-degree assault could serve as an underlying felony in support of a second-degree felony murder conviction under Maryland law.[11] (ECF 25, Ex. 13 at p. 15). The post-conviction court credited counsel's testimony as to the explanation concerning the length of

---

[11] *See Roary v. State,* 385 Md. 217, 230 (2005) (first-degree assault is proper underlying felony to support a second-degree murder conviction). This Court notes that *Roary* also holds that felony murder in any degree does not require that the defendant actually commit the murder. *Id.* at 229.

the indictment, finding it constituted a "valid, tactical reason for not requesting a second degree felony murder instruction" (ECF 16, Ex. at p. 9), ignored counsel's proclaimed ignorance of the law, and found Edwards' contention that the jury would have convicted him of a lesser offense "merely speculative and without merit." (*Id.* at p. 10).

Edwards now argues that the post-conviction court's determination is erroneous, because counsel could not have strategically refrained from requesting an instruction on second-degree felony murder when he did not even know that it would have been appropriate to request the charge in the case.  Edwards also contends that even if one were to predict that, had counsel known the instruction was warranted (even though he did not) he would have refrained from requesting it anyway, that decision would not be constitutionally acceptable, citing *DeCastro v. Branker*, 642 F.3d 442, 451 (4th Cir. 2011) ("we ask whether the strategy counsel chose was objectively reasonable").  Edwards posits that given the specific facts of his case and the possibility that the jury would find that he had committed a first-degree assault, it was unreasonable for counsel to risk that a jury would convict him of first-degree felony murder when only a conviction on second-degree felony murder was legally sustainable as a result of the assault conviction. Thus, he argues, he suffered prejudice because he was sentenced to life imprisonment, rather than a maximum of 30 years.  (ECF 32 at 11-15).  Edwards cites *United States v. Dornhofer,* 859 F.2d 1195, 1199 (4th Cir. 1988) to support his contention that he had a right to an instruction on second-degree murder.

Dornhofer was convicted of receiving child pornography by mail.  On appeal, he argued that the district court erred in refusing to instruct the jury as to his theory of the case, i.e., that his purchase and receipt of the material was inadvertent and, alternatively, that possession of obscenity in the home is constitutionally protected.  The appellate court found the trial court

provided an adequate instruction as to the knowing and willful receipt of child pornography, and that no instruction was required as to possession of obscenity in the home, because the crime charged involved his knowing receipt of child pornography in the mail,  and not merely possession of it.  *Id.,* 859 F.2d at 1199.

Edwards' reliance on *Dornhofer* is misplaced.  As noted by Respondents, Edwards' defense was that he was not the shooter who committed the murder and was not even present at the scene, *not* that the crime committed was a lesser form of murder.  (ECF 16, Ex. 6, pp. 103-150; ECF 29 at p. 16).

Given the facts adduced at trial, Edwards was not prejudiced by trial counsel's failure to request a second-degree murder instruction.  Habeas corpus relief is not required pursuant to 28 U.S.C. §§ 2254(d)(1) or (2).

### C.     Cumulative Effect of Errors

In his final claim, Edwards asserts entitlement to relief based on the cumulative effect of trial counsel's errors.  This claim is foreclosed as a matter of law.  *See Fisher v. Angelone*, 163 F.3d  835, 852–853 (1998) (rejecting cumulative effect analysis on ground that ineffective assistance of counsel claims are to be reviewed individually, not collectively).  A cumulative error analysis would apply only to the effect of those matters actually determined to be constitutional error and not the cumulative effect of all matters alleged or deemed deficient.  *Id.* Having examined the state court rulings and having independently examined the record, this Court is satisfied that when applying the *Strickland* standard to the instant allegations of  trial counsel's allegedly deficient performance, Edwards has not demonstrated the prejudice necessary to establish his trial attorney's ineffectiveness.  *See* 28 U.S.C. § 2254(d); *see also Stamper v.  Muncie*, 944 F.2d 170, 178 (4th Cir. 1991).  The state courts' rejection of Edwards'

claims are neither contrary to clearly established federal law, nor did they involve an unreasonable application of that law.

## CONCLUSION

Having failed to rebut the presumption of correctness according to the findings of fact made by the state courts in rejecting his claims for appellate and post-conviction relief, Edwards is not entitled to federal habeas relief.  Further, there is no basis upon which to find constitutional deficiencies in the state court proceedings.

While he may appeal this determination, he must first obtain a Certificate of Appealability ("COA").   A COA may issue Aonly if the applicant has made a substantial showing of the denial of a constitutional right.@  28 U.S.C. ' 2253(c)(2).  A petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (citation and internal quotation marks omitted), or that "the issues presented are adequate to deserve encouragement to proceed further," *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  Because there has been no substantial showing of the denial of a constitutional right, this Court declines to issue a COA.[12] *See* 28 U. S.C.§ 2253(c)(2).

A separate Order follows.

Date: <u>January 18, 2017</u>                        _____/s/_____
                                                     RICHARD D. BENNETT
                                                     UNITED STATES DISTRICT JUDGE

---

[12] Edwards may request a COA from the United States Court of Appeals for the Fourth Circuit.